The next case today is John Doe v. Brown University, appeal number 20-2023. Attorney Kaplan, please introduce yourself for the record and proceed with your argument. Thank you. Good morning, judges. Susan Kaplan for Plaintiff Appellant John Doe, and I would like to reserve two minutes to rebut. Yes. Thank you. So, the briefs submitted are very detailed. I want to focus on some misapplications of the law by the lower court and misapplications of fact by both the lower court and defendant. With regard to the latter, both the lower court and Appellee Brown University focused on a claim that mother of John Doe, who is an African-American student at Brown was, he subsequently graduated, who was the subject of a couple of disciplinary actions regarding sexual harassment, and of course, we'll go through a fact pattern, that the mother represented that defendant, Suarez, referred to him as a boy in the context of, we got your boy now, and attributed to that, racist connotations. She later could not recall if she in fact was told that Ms. Suarez said that, and for this reason, the lower court dismissed the plaintiff's 1981 claim, which relies on but for evidence in establishing the prima facie case under the McDowell-Douglas burden-shifting analysis. I'm afraid that both the lower court and defendant are trying to backdoor direct evidence of discrimination, thereby making whether Ms. Suarez said boy or not boy in whatever context or intonation she meant to say it, regardless, giving it the best or worst spin, however you want to look at it, that it was meant to be a racist connotation, that would constitute direct evidence of discrimination. We are relying on indirect evidence of discrimination to establish our prima facie case. The but for evidence comes from the whole panoply of facts in the case, but most essentially, the intent or the motive of Brown and how that seems to correspond with racist tropes and history, in fact, in our society and at Brown. Most importantly, the but for requirement under Comcast is permitted to be, has been interpreted to be, and there's not much interpretation on this, the Comcast cases from 2020, the Supreme Court commented on it later in the year in Bostock v. Clayton, where it said that there could be multiple but for causes that will self-establish the prima facie case. For example, both the defendant and the plaintiff, and it gave an example of the defendant could have not turned on a turn signal and a plaintiff, using an example of a traffic accident, and the plaintiff could have gone through the red light, and both of them could have done something wrong, and we still have a but for case. So what's your indirect evidence here? The indirect evidence, primarily, is that in the very first instance, from the very first moment that plaintiff came in contact with the process at Brown, he was cut off from being allowed to exercise his rights, and that he, in Brown's policies, he would have been entitled to make what we would understand to be a counterclaim. In other words, Jane made a claim against him in a sexual harassment case, and he made it known to Brown that A, he had very strong allegations against Jane, in that she tried to asphyxiate him, she bit him, without his consent, and that the rules were very clear, confirmed by both defendants Torres and Klawun, that he could make a counterclaim. However, that he should have been able to make a counterclaim, that's not what they told him. What they told him is that he had to wait and let Jane's case carry on first, and then he could bring his own case in the secondary position. When you say they, I think you're referring to the advisor whom he had selected? No. I'm relying on defendant Yolanda Castillo-Apollono, who is sort of the administrator for Brown, and she administers to both students in what's called Title IX cases, through sexual harassment, in moving along the process of the case. He went to her and asked her if he could make a, well, what amounted to a counterclaim, he wanted to bring a claim against her in the initial case, and even though that was the rules and procedures, she said no, wait, and he was not allowed to exercise his rights. That's his first bit of problem. The secondary problem also occurring during that first case was that they rewrote, they wound up with a sanction of deferred suspension. Now, he was only found, he was accused of multiple things by Jane, he was only found responsible for lifting her skirt after Jane didn't want him to. The claims that he had against her, which he was able to present in his defense, and only in his defense, Jane would not suffer any consequences or not be sanctioned. He wound up with what's called a deferred suspension, which in and of itself says you're not going to lose time from school, you get to stay in school, but you have a chance here to redeem yourself, and you're given an opportunity to demonstrate your ability to abide by the community's expectations. They rewrote it to say that during the period of your deferred suspension, any allegation that you violated the standards of student conduct will receive greater scrutiny, will increase likelihood that the matter is resolved through a hearing, in which more serious outcomes are possible, including separation from the university. How does that end up being injury? Because my memory of the record is that there's no further sanction, right? He's not subject as a result of that deferred suspension to any further sanction in regards to that matter, if I recall correctly. How does that amount to injury? Well, it started a rollercoaster of accumulated allegations coming from one source, Jane, who repeated acts of retaliation, which Brown overlooked. Retaliation is not permitted at the school in two specific circumstances. One is, you're not supposed to talk about the person, make accusations about the person, along those lines. So, Jane, who received the deferred suspension term in her copy of the sanctions notice, was aware that any allegation may trigger the school's response and heavy-handed response in this way. So, Jane had a meeting with her sorority sisters, she talked about John, she asked them if they had any experiences with John, John Doe, and one student rose up, she said, Oh, I had an encounter with him. I must note that her encounter in her own description included the words of gentleness, consensuality, but nevertheless, it was an allegation. She found herself in an uncomfortable situation, she made it clear that she did not think it was sexual harassment, she made it clear to Brown that she was only bringing this in support of other women at the school. The only other woman who had any interest in this was Jane, and that triggered a number of events, a very lengthy investigation that violated a number of policy provisions that would have protected John. I started this line by talking about Comcast and Section 1981, but four elements. 1981 protects minority rights under contracts. What I'm trying to piece together is that by rewriting the deferred suspension term, they already violated the contract, the policies considered to be an applied contract in this  school, they already violated it, they took away protections of the policies, and in doing so, left him without any recourse. Let me pause you right there, Ms. Kaplan, and ask the panel if you would like to follow up on any other points at this point. Okay, so seeing none, you have reserved some time. I would ask you to mute your devices. We'll hear from Mr. Richard. Good morning, Your Honors. May it please the Court. Stephen Richard on behalf of Defendant Apelli, Brown University. Your Honors, plaintiff enrolled at Brown University in September 2013, graduated in May of 2018. The crux of his case focuses on his first 13 months at Brown, from his enrollment in September 2013 until his decision to take a medical leave at the end of October 2014. I would just like to very briefly address two subsequent matters that I think can be dispelled very quickly. Upon his return to Brown, he reapplied for admission. Brown initially denied the request due to insufficiency in paperwork. He took an appeal. He was readmitted over the summer. He started school just as he planned in September 2015, and proceeded to his graduation three years later. He also protests upon his first year back that Brown amended a no-contact order that arose from the first disciplinary case that at that time initially was mutual, but Brown changed its policies in the interim to make unilateral no-contact orders applicable in cases of responsibility. He protested vigorously about the change, as is stated in the record, but the bottom line is he has not identified a single instance where that amended no-contact order ever prevented him from doing anything he wanted to do with Brown University, and the record shows the rather robust campus life he led on the athletic field, on the theater stage, and in social life throughout the campus. Focusing on the first 13 months, which is the crux of this case, it's important to look at that time period based upon what particularly has been pled, what has been preserved, and what remains timely. The plaintiff has not addressed the statute of limitations issue that Judge McConnell carefully traced in his summary judgment ruling. The plaintiff essentially did not file this lawsuit until May 2017. All of his claims except the 1981 claim were subject to a three-year limitation period, so none of them can touch the first disciplinary case, which ended in March of 2014, except the 1981 racial discrimination case claim. The record shows that that was a split result, that the plaintiff, by his own admission, testified under oath in his deposition, I had no problem with the result, I didn't take an appeal because I was good with the result, and I was thankful that I only got a deferred suspension. Frankly, what mattered most to him in his own words was the ability to play lacrosse, which he did that spring. As Judge Casper correctly noted, there was no subsequent sanction after the deferred suspension, which was for a one-year period of time. Nothing ever ensued in the way of any disciplinary sanction against this plaintiff thereafter, and there is no disciplinary mark on his final Brown transcript. So, Your Honors, looking at the first disciplinary case through the only applicable claim, Section 1981 claim, he has not shown racial discrimination in the least. In fact, the person who was most upset with the result was the complainant who took an appeal, arguing that this particular respondent should have been expelled or suspended from Brown, removed from the campus. Brown rejected that appeal and ruled in plaintiff's favor. What subsequently happens near the end of his first year is a second complainant comes forward, who testified at her deposition. She was not pressured to file the complaint. She wanted to file the complaint. She asked for a no-contact order, and Brown had a duty, as Judge McConnell appropriately determined, to investigate that particular claim. Now, in this particular claim, because it falls within the three-year limitation period, he has not only his racial discrimination claims under Section 1981 in Title VI, but he's only preserved on appeal a very narrow Title IX claim pertaining to the second disciplinary case, which is a selective enforcement claim, a portion of count four. The only comparator that he raises is Jane, the complainant in the first disciplinary case. It's important to look at the plaintiff's status at the time this second complaint came forward. He had been found partially responsible for sexual misconduct charges. He was on a deferred suspension, and he now was the subject of a second sexual misconduct complaint. He has identified no comparator who was similarly situated. His argument that mostly men were respondents at Brown has been rejected by this court in both the Boston College case as well as Haydick. Schools do not control the gender of complainants, and there's nothing suggesting that the fact But let's be perfectly clear what he's trying to do through this selective enforcement claim. He's trying to backdoor in his time-barred selective enforcement claim as to the first case. He's trying to make Jane the comparator and say that you should have punished her, not me. The problem is that claim was dismissed at the Rule 12B6 stage as untimely. The selective enforcement claim was subject to a three-year limitation period. There's no continuing violation extension. Judge McConnell was crystal clear at the 12B6 stage it was untimely, and plaintiff has not appealed that. So there is no gender discrimination in connection with the second case that was brought against him. In fact, he was allowed to complete the semester on campus. The case was closed over the summer with no investigation findings against him and certainly no sanction. So the selective enforcement argument that the severity of the sanction was gender discriminatory does not apply here because there was no sanction. What about the threat to reopen the case? Well, the threat to reopen the case, Your Honor, I think is what the plaintiff alleges occurred during the October 2014 meeting when he had taken a very serious action. The deans said the contrary. They said they were very concerned about the plaintiff's well-being. But let's be clear focusing on that meeting, where it stood. When the plaintiff returned to Brown, admittedly, he was struggling. He was struggling academically and emotionally. He was failing his classes. He testified in his deposition that he had already failed one class at the midpoint of the semester and was very likely going to be suspended academically. He spent the night on October 27th socializing with friends, smoking a considerable amount of marijuana, and a serious incident occurred thereafter. If you turn to the meeting itself, as I understand it, his psychiatric counselor had warned the college and university not to bring him in the next day. And they not only bring him in, but they threatened to reopen what they knew was a bogus complaint, the second one being. Well, Your Honor, they did not know it was a bogus complaint at that time, nor did they ever get noticed that it was bogus. They had no basis to know there was anything to it to threaten to reopen it. Well, the deans disputed that comment, Your Honor. It was a contention that the plaintiff made. But for summary judgment, that doesn't help you. But Your Honor, I would submit that that is not tied to the gender discrimination claim, which is selective enforcement as to the second disciplinary proceeding. No, it's tied to the tort claim. It's tied to the intentional infliction of emotional distress claim only. But to be clear, the second case was never reopened by Brown University at any particular time. So focusing on the. But you keep evading what I think this is rule 56, right? Correct. We've got to take the facts as viewed favorably to the plaintiff with respect to that meeting. And I still haven't heard you an explanation as to why it was an extreme and outrageous conduct to in the face of the warning, not only call him back in, but then to threaten him with something like reopening that second proceeding. Your Honor, I would admit that the plaintiff made that contention in the record. The situation at that time, there were also complaints coming forward that he was violating the no contact order. The situation as it arose at that particular time was that he had already decided to take the leave of absence before he stepped foot in that room. That is what he pled. He himself said he could not have sustained his performance academically at Brown and testified in his deposition that he had already decided that he knew that he had to take a leave of absence. Your Honor, I would. If Brown understood that to be the case, then why did they need to threaten him? Well, they didn't understand that to be the case because as he pled in his complaint unknown to Brown, he had already decided to take the leave. He did not tell Brown when he came into the meeting. I've decided to take a leave of absence as he's pled in his complaint. Paragraph 105 on the advice of his medical providers to do so. So he never came into the meeting and said to Brown, I'm taking a leave of absence. That was a meeting where they all got together. It admittedly was tense. It was a tense and contentious meeting where plaintiff's mother was very vocal in her disapproval of Brown. But, Your Honor, the bottom line from our respectful submission is Judge McConnell said that this plaintiff was struggling at the time, did not tell Brown of his decision when he stepped foot in that room, and had testified in this case admittedly that he knew he had to take the leave of absence on medical advice to sustain himself going forward, which is exactly what he did. And as the court found below, and respectfully I would ask the court to put in the context of the big picture, Judge McConnell correctly noted that Brown made several academic and personal accommodations to this plaintiff, gave him access to many resources to allow him to graduate. So the contention that Brown was intent on throwing this particular young man out of school or depleting his education opportunities is contended in the opening brief of this appeal. Frankly, it's just dispelled by the amount of resources and support that were given to him to enable him to graduate when his own actions at time imperiled his graduation by skipping classes, by misaligning his priorities. You seem to be saying that even though a jury might be able to find their conduct extreme and outrageous, which you dispute, it didn't cause him significant harm because he was going to not proceed forward that year anyhow. You seem to be addressing the damages rather than the conduct. Well, Your Honor, I would respectfully submit that this was not extreme and outrageous conduct. I would distinguish it from the Russell case on which the plaintiff relies. There, the situation was there was a student who suffered from obesity. There was a year or more of public statements about her obesity, essentially putting her on display, for lack of a better term. This isn't the Russell case, but it does sound pretty extreme after a psychologist has warned you the person's in a fragile situation to not only go ahead and call them in, but then, and I know Brown disputes it, but for Rule 56, we have to presume, to then threaten him with reopening that second case sounds pretty outrageous, doesn't it? Well, Your Honor, I would again acknowledge that's what he contended was his version of the meeting. The record states that I would respectfully submit that Judge McConnell's analysis recognizing the nature of these disciplinary cases, particularly in light of where everything stood at the time, does not meet the high burden of extreme and outrageous conduct. And I would ask the court to put in perspective the fact that plaintiff had already decided that he was leaving Brown for the year and did not tell them that by his own pleading. So, Your Honor, if you can just help me put a finer point on this. So, you dispute that the threat was made, but if the threat was made, then what's the point? Why is it not outrageous? Well, Your Honor, I don't think it's outrageous if the concern was a student who was violating Brown's conduct procedures and there was a series of complaints by Jane Doe that she was being stalked by the respondent at that particular time. She herself submitted those complaints in October. The plaintiff himself never complained once that Jane Doe was violating the no contact order or retaliated against her. The situation in its entirety at that point in time led the deans to call a meeting. They said what they said. And as Dean Coellen testified, her concern was the well-being of the student. And the decision had been made that he would take a leave of absence at that particular time. All right. Thank you. If Your Honors have no further questions, I would rest on my brief. If you would mute your devices at this time. Ms. Kaplan. Thank you. Very quickly. Just focusing on that meeting. Jane did not allege that John stalked her. She had come in with a series of alleged no contact order violations, which she herself said were minimal. They all had to do with bumping into him at local restaurants or events at school in which he left immediately. For this, they violated their procedures once again and threatened him at the meeting that he would have to, on the day he left the hospital after his four days recovery from his suicide attempt, that he would have to leave his lodgings that day. Brown relies on the amended complaint, but we have to go where the facts go. The psychiatric records from when the suicide attempt to when he was released are replete with talking to his doctors. I don't want to leave school. I want to play with my team. I know my academics hurt, but is there a way I can stay? Is there a way I can stay? They were not aware that he wasn't going to go. In fact, we have defendant Klawun after the meeting saying if he doesn't come in today without telling us he's going to go, we have to come up with something. He has got to go. Their intent to remove John from school is very clear. After he did take the medical leave, I would say under tremendous duress and coercion, and even though he took a leave believing that he was going to come back, believing that he's facing the second Title IX case, the NCO violations. They didn't say they were going to take it away. It wasn't a quid pro quo. You leave and all this goes away. These were the threats hanging over his head. Ms. Apolliano wrote to Jane or brought her in for a meeting and indicated to her, Jane reported it to her advisor, that John is going to be gone from campus through 2016. He may not come back at all. He was in fact supposed to come back in 2015. Thank you, Ms. Kaplan. That concludes argument in this case. Attorney Kaplan and Attorney Richard, you should disconnect from the hearing at this time.